## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 21 2016, 6:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of N.C., a minor child, and his Father, <br><br> C.C., <br><br> *Appellant-Respondent,* <br><br> v. <br><br> The Indiana Department of Child Services <br><br> *Appellee-Petitioner* | June 21, 2016 <br><br> Court of Appeals Case No. 49A02-1510-JT-1564 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn A. Moores, Judge <br><br> The Honorable Larry E. Bradley, Magistrate <br><br> Trial Court Cause No. 49D09-1502-JT-71 |

**Mathias, Judge.**

[1] C.C.'s ("Father") parental rights to his minor child, N.C., were terminated in Marion Superior Court. Father appeals the involuntary termination of his parental rights and argues that the trial court's judgment is clearly erroneous because 1) his due process rights were violated due to lack of notice of the Child in Need of Services ("CHINS") proceedings, and 2) the Indiana Department of Child Services ("DCS") did not provide services to him in West Lafayette, where he resides.

[2] We affirm.

## Facts and Procedural History

[3] In 2012, six-year-old N.C. was adjudicated a CHINS and removed from his mother's care. N.C.'s mother was not providing him with an adequate home or food. N.C. has special needs and suffers from Post-Traumatic Stress Disorder, Oppositional Defiant Disorder, Attention Deficit Hyperactivity Disorder, and Reactive Attachment Disorder.

[4] Father failed to participate in N.C.'s life for approximately eight months before N.C. was removed from his mother's home, but he did pay child support. N.C.'s mother did not advise Father of N.C.'s removal by DCS or the CHINS proceedings. His mother also failed to provide DCS with Father's contact information. N.C. was placed in a foster home in Indianapolis.

[5] DCS attempted to locate Father but could not find him. DCS served Father with notice of the CHINS proceedings by publication. Father, who lives in West Lafayette, learned of the CHINS proceedings a few days prior to the

December 18, 2013, permanency hearing. N.C.'s mother finally contacted Father to tell him about the hearing. Father appeared at the hearing, and counsel was appointed to represent Father.

[6] Father is married and has a child that resides in his home. Father has another child and exercises weekend visitation with the child. N.C.'s family case manager and guardian ad litem supported N.C.'s reunification with Father but recommended therapeutically supervised visits between them because Father had been absent from N.C.'s life for over two years and due to N.C.'s mental health and special needs. Father did not believe a therapist was necessary. The family case manager was concerned with Father's attitude because N.C. "is an emotional fragile young guy." Tr. p. 18. The trial court ordered supervised parenting time between Father and N.C.

[7] The first supervised visit took place in Indianapolis on April 15, 2014, and N.C.'s therapist was present. The visit went well and shortly thereafter, the trial court ordered unsupervised visitation for Father and N.C. at Father's home in West Lafayette. However, Father was arrested for domestic battery in May 2014, and thereafter, the trial court ordered visitation changed to supervised. Ultimately, Father was not charged for the incident that led to his arrest, and DCS requested, but the trial court declined, to order Father to undergo a domestic violence assessment.

[8] Father's subsequent visitation with N.C. was inconsistent. In July 2014, Father visited with N.C. only one time even though he could have visited four times

that month. Father was responsible for arranging visits and verifying that he would attend, but he failed to do so. Father claimed he could not visit N.C. because of work and an inability to pay for the gas needed to travel to Indianapolis. However, DCS provided Father with gas cards to assist with travel expenses. Father's missed visitations caused N.C. to suffer from increased anxiety. N.C. was also angry with Father for failing to participate in visitation.

[9]     In August 2014, Father was ordered to participate in family therapy with N.C.'s therapist in Indianapolis. Father completed only one therapy session, which occurred on the same day as a supervised visit. Because Father failed to participate in therapy, N.C.'s therapist could not recommend that N.C. be placed in Father's care.

[10]    Unsupervised visitation was reinstated in October 2014. However, after the first unsupervised visit, N.C. had bug bites on his body. N.C. also reported that he had not taken his medicine and did not have a bed to sleep in. Unsupervised visits were never reinstated.

[11]    Father has not participated in visitation with N.C. since October 17, 2014. Father claimed an inability to do so due to work and transportation issues. However, he also stated he failed to visit with N.C. because he did not agree that his visitation should be supervised. Tr. p. 35. The family case manager also referred Father to home-based therapy in Tippecanoe County, but the therapist was not able to make contact with Father. Tr. p. 34.

On February 26, 2015, DCS filed a petition to terminate Father's parental rights.[1] The fact-finding hearing was held on September 1, 2015. The trial court issued an order terminating Father's parental rights to N.C. on September 15, 2015. The trial court found and concluded that:

> 3. [N.C.] has special needs which include Post Traumatic Stress Disorder, Oppositional Defiant Disorder, Attention Deficit Hyperactivity Disorder, and Radical Attachment Disorder. He exhibits negative behavior including physical aggression, and has a hard time adjusting to peers and authority figures.
>
> ***
>
> 11. [Father] first appeared in the ChINS case on December 18, 2013, the first Permanency Hearing. He requested and was appointed a public defender who represented him throughout the ChINS matter.
>
> ***
>
> 13. The family case manager at the time requested [Father] to reach out to [N.C.'s] therapist prior to visits starting.
>
> 14. [Father] disagreed with the request to meet with the therapist but eventually did so and visits commenced a few months later.

---

[1] N.C.'s mother was dismissed from the termination proceedings after she signed consents to allow N.C. to be adopted. Therefore, she does not participate in this appeal.

15. The plan at the time was for therapeutic visits to begin up to overnights and have [N.C.] placed with his father by the start of school in the fall of 2014.

16. Due to his special needs, the therapeutic visits were to help [N.C.] prepare and be emotionally ready to be placed with his father.

17. [Father] had last seen [N.C.] in September 2011.

18. The ChINS Court ordered unsupervised visits between [N.C.] and his father on May 7, 2014.

19. On May 20, 2014, the Court moved visitation back to supervised after [Father] was arrested after a domestic dispute.

20. After visits returned to supervised status, [Father's] participation dropped off. From July through September 2014, [Father] exercised only two visits.

21. [Father] was incarcerated overnight and no formal charges were filed.

22. Family therapy was ordered to take place at the visitation sessions.

23. Due to inconsistent visits, and the negative impact missed visits had on [N.C.], the IDCSMC moved to suspend [Father's] parenting time. The Court denied the request and ordered unsupervised weekend visits, over the IDCSMC and Guardian ad Litem's objections.

24. On October 15, 2014, home based therapy was ordered for [Father] through an agency in Tippecanoe County.

25. After an unsupervised weekend visit took place in October 2014, [N.C.'s] foster mother reported bug bites on [N.C.], roaches in his suitcase and other issues with the visit. [N.C.] was not given his mental health medications.

26. On November 5, 2014, the ChINS Court once again suspended [Father's] parenting time.

27. A 310 report of the visit came back unsubstantiated.

28. [Father] was granted supervised parenting time, with authorization for unsupervised parenting time upon positive recommendation from service providers, IDCSMC and the Guardian ad Litem at a Periodic Review Hearing held on November 12, 2014.

29. By the time of the February 11, 2015 Permanency Hearing, [Father] had not exercised his therapeutic parenting time with [N.C.]. He did not agree with visits being supervised.

\*\*\*

31. The home based therapy was referred to an agency in Tippecanoe County. Contact with [Father] was never accomplished.

32. Between October 2014 and June 29, 2015, [Father] did not contact a family case manager. He did not inquire as to the referred home based therapy, or request visits during that time.

33. After October 2014, [Father] did not attend, in person or telephonically, monthly child and team meetings. Prior to that he attended approximately two meets [sic] in person and one telephonically.

34. He has called [N.C.] once, after the foster mother called him.

35. [Father] resides in an appropriate home with his wife and child. He has visitation with a daughter.

36. [Father] provides therapy for his son through First Steps.

37. Although he did not know [N.C.'s] whereabouts, he was paying child support.

38. [N.C.] has resided in therapeutic foster care with [M.M.] for close to three years. This placement is now preadoptive.

***

39. [N.C.'s] behaviors are better when there is no change in routine. Disruptive behavior is observed when things are not consistent with him.

***

42. Romunda Valentine was [N.C.'s] therapist until February 2015. She worked with [N.C.] on his anxiety, anger and aggression issues.

43. Ms. Valentine believes that a huge part of [N.C.'s] anxiety comes from being stabilized, then having that interrupted. The resulting high anxiety interferes with other parts of his life.

44. Ms. Valentine questioned [Father'] understanding of, and insight into, [N.C.'s] needs. Due to the inconsistency of the therapeutic visits, [Father] had not demonstrated to her the insight of knowing the structure and routine that is needed, and needed to know the dynamics of what [N.C.] had been through.

Appellant's App. pp. 14-16.

## Due Process

[13] For the first time on appeal, Father argues that his due process rights were violated throughout the CHINS proceedings.

> The Due Process Clause of the U.S. Constitution and the Due Course of Law Clause of the Indiana Constitution prohibit state action that deprives a person of life, liberty, or property without a fair proceeding. Parental rights constitute an important interest warranting deference and protection, and a termination of that interest is a unique kind of deprivation. However, children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships. When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process.

*In re C.G.*, 954 N.E.2d 910, 916-17 (Ind. 2011) (internal quotations and citations omitted).

[14] The process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged

procedure. *A.P. v. Porter Cnty Office of Family & Children*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000,) *trans. denied*. The private interest affected by the proceeding is substantial — a parent's interest in the care, custody, and control of his or her child. *Id.* (citation omitted). The State's interest in protecting the welfare of a child is also substantial. *Id.* Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions. *Id.*

[15] Any procedural irregularities in a CHINS proceeding may be of such significance that they deprive a parent of procedural due process with respect to the termination of his or her parental rights. *Id. at* 1112-13. Indeed, "due process protections at all stages of CHINS proceedings are 'vital' because '[e]very CHINS proceeding "has the potential to interfere with the rights of parents in the upbringing of their children."'" *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014) (quoting *In re K.D. & K.S., S.S. v. Ind. Dep't of Child Servs.*, 962 N.E.2d 1249, 1257 (Ind. 2012)).

[16] Nevertheless, a parent may waive a due-process claim in a CHINS or termination proceeding by raising that claim for the first time on appeal. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 194-95 (Ind. Ct. App. 2003); *see also In re K.S.*, 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001) (by raising issue for first time on appeal, mother waived due-process claim that trial court violated her rights in failing to follow statutory requirements governing permanency hearings, case plans, and dispositional orders). Moreover, our supreme court has acknowledged "that in many situations where

DCS is involved, it is common for the children to have absent or even unknown parents. In those situations, it is critical that DCS properly serve all parties, by publication if necessary, and if the absent parent is not present, a default judgment could be entered. In such circumstances, it would not be necessary to give that absent parent a second bite at the apple of the fact-finding hearing." *In re K.D.)*, 962 N.E.2d at 1257.

[17] In May 2012, when DCS removed N.C. from Mother's home, Father had not seen the child for approximately eight months. Although he was paying child support, no evidence in the record indicates that Father attempted to see N.C. after he last visited him in September 2011. Moreover, no evidence in the record indicates that Father attempted to see N.C. in the ensuing months after N.C. was adjudicated a CHINS. Father finally learned of the CHINS proceedings a few days prior to the December 18, 2013, permanency hearing after Mother contacted him. Mother did not give Father's contact information to DCS, and DCS attempted to locate Father and served him by publication.

[18] Father argues lack of due process because he did not have notice of the CHINS fact-finding hearing. He also blames DCS and Mother for the lack of notice. However, Father's own absence from N.C.'s life for more than two years contributed significantly to DCS's inability to find Father. Furthermore, Father was offered services and appointed an attorney when he appeared at the December 2013 permanency hearing. The CHINS proceedings continued with the goal of reunifying N.C. and Father for over a year after Father appeared in

the case. For all of these reasons, we cannot conclude that Father was denied due process during the CHINS proceedings.

## Sufficient Evidence

[19] Father also argues that the trial court's judgment terminating his parental rights is not supported by sufficient evidence. "The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests "must be subordinated to the child's interests" in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

[20] Indiana Code section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

> (2) The petition must allege:
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the wellbeing of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. Clear and convincing evidence need not establish that the continued custody of the parents is wholly inadequate for the child's very survival. *Bester v. Lake Cnty Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Rather, it is sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. *Id*. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

The trial court must enter findings of fact to support its conclusions. Ind. Code § 31-35-2-8(c). Moreover,

We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then

whether the findings clearly and convincingly support the judgment.

*In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014)

[23] The trial court entered the following conclusions of law concerning the statutory factors in Indiana Code section 31-37-14-2:

> 49. There is a reasonable probability that the conditions that resulted in [N.C.'s] removal and continued placement outside the home will not be remedied by his father. Due to an inconsistency in services, and then a failure to continue with supervised parenting time toward recommended unsupervised visits, [Father's] ability to meet [N.C.'s] special needs have not been demonstrated. At the time of trial in this matter [Father] had not had contact with his son for then months. The Court questions [Father's] willingness to complete services after parenting time was ordered supervised.

> 50. Continuation of the parent-child relationship poses a threat to [N.C.'s] well-being. [N.C.] needs to move forward to embrace the permanency of being adopted by [foster mother] and have knowledge that he will have consistency and routine. To experience the uncertainly of visits, or to be removed from his home and caregiver, would only be detrimental to [N.C.].

Appellant's App. p. 16. The trial court also found that termination of the parent-child relationship was in N.C.'s best interests and DCS had a satisfactory plan for N.C.'s care and treatment.

[24] Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need only address Father's argument that the DCS did not prove

continuation of the parent-child relationship poses a threat to N.C.'s well-being. A trial court "need not wait until a child is irreversibly influenced by a deficient lifestyle such that [his or] her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 649 (Ind. 2015) (citation omitted). "In determining whether the continuation of a parent-child relationship poses a threat to the children, a trial court should consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re A.P.*, 981 N.E.2d 75, 81 (Ind. Ct. App. 2012).

[25] Father complains that his parental rights to N.C. were terminated because he was unable to travel to Indianapolis from West Lafayette for services and visitation. We agree that DCS could have provided more aid to Father to assist him with the travel between the two cities[2], especially considering his limited resources, his young child at home, and his third child that he visits on weekends.

[26] However, DCS's response to Father's requests for more assistance and unsupervised visitation time (in lieu of the supervised time he was offered) must be considered in light of his history with N.C. Father claims that for a brief period in September 2011, N.C. was residing in his home, until Mother and her boyfriend demanded that N.C. be returned to them.

---

[2] DCS provided Father with a few gas cards.

[27] Thereafter, Father did not have any contact with Mother or N.C. for over two years until Mother contacted Father in December 2013 to advise him of the CHINS proceedings. Father appeared at the December 18, 2013, CHINS permanency hearing, and he was appointed a public defender. N.C.'s family case manager asked Father to meet with N.C.'s therapist prior to visits starting due to N.C.'s special needs and mental health diagnoses. Father disagreed with case manager's request but did eventually meet with the therapist and visits commenced in April 2014.

[28] Father had one unsupervised visit with N.C. in May 2014, but before another could occur, he was arrested for domestic battery. Although Father was not ultimately charged with the offense, the trial court understandably ordered his visitation with N.C. to return to supervised. Father disagreed with the court's order and only exercised two visits with N.C. from July 2014 to September 2014. Father's lack of visitation had a negative impact on N.C.

[29] In October 2014, Father was ordered to participate in home-based therapy through an agency in Tippecanoe County. Father was also allowed an unsupervised visit with N.C. over a weekend in October 2014. When N.C. returned to his foster home, he reported that he had slept on the floor and had not been given his mental health medications. N.C.'s foster parent reported that

he had bug bites on his body and roaches in his suitcase.[3] Therefore, Father's parenting time was suspended.

[30] Despite this incident, in November 2014, the trial court reinstated Father's parenting time. The court ordered that his parenting time would be supervised but could returned to unsupervised status upon positive recommendations from the service providers and guardian ad litem. Father failed to exercise any parenting time with N.C. after the October 2014 unsupervised visit because he did not believe his visitation with N.C. should be supervised. Therefore, in February 2015, the trial court changed N.C.'s permanency plan from reunification with Father to adoption.

[31] N.C. was not placed in Father's home when he was removed from Mother's care because Father had been absent from his life for several months on the date of removal and DCS did not have enough information to locate him. Father's abandonment of N.C. continued until the December 2013 hearing. Father was not compliant with DCS's request that he participate in therapy, a reasonable request considering his abandonment of the child and the child's special needs. Father also demonstrated that he was not willing to participate in supervised visitation.

[32] Father's excuses for failing to participate in supervised visitation might explain a few missed visits, but they cannot excuse his failure to exercise visitation with

---

[3] A 310 report of the visit came back unsubstantiated.

N.C. after October 2014. After October 2014, he also failed to participate, either in person or telephonically, in the monthly team meetings.

[33] N.C. suffers from anxiety and anger and aggression behavioral issues. Father's inconsistent visitation aggravates those issues. N.C.'s troubling behaviors escalated both in his foster home and at school due to Father's inconsistent visitation. Father does not understand N.C.'s need for stability, structure and routine.

[34] For all of these reasons, the trial court's conclusion that a reasonable probability exists that the continuation of Father's and N.C.'s relationship poses a threat to N.C.'s wellbeing is supported by sufficient evidence.

## Conclusion

[35] Father's due process rights were not violated during the CHINS proceedings. Sufficient evidence supports the trial court's judgment terminating Father's parental rights to N.C.

[36] Affirmed.

Vaidik, C.J., and Barnes, J., concur.